**NEW YORK MERCHANDISE CO., Inc.**

v.

**UNITED STATES.**

**C.D. 3746; Protest No. 66/4208–1047.**

United States Customs Court,
First Division.
March 20, 1969.

Stein & Shostak, Los Angeles, Cal. (S. Richard Shostak, Los Angeles, Cal., of counsel), for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Herbert P. Larsen and Glenn E. Harris, New York City, trial attorneys), for defendant.

Before WATSON, MALETZ, and RE, Judges.

MALETZ, Judge.

The question in this case concerns the proper tariff classification of certain articles known as poodle dog radios that were imported from Japan via the port of San Diego, California. Each consists of a stuffed figure of a poodle dog in the inside of which is a transistor radio that is operated by external volume and tuning control knobs. The articles were classified by the government under item 737.30 of the Tariff Schedules of the United States (19 U.S.C. § 1202) as toy figures of animate objects, not having spring mechanisms, and assessed with duty at 18 percent ad valorem. At the trial, the government asserted an alternative classfication under item 737.90, as toys, not specially provided for, dutiable at 35 percent ad valorem.

Plaintiff claims that the importations are properly classifiable under item 685.-

22 as radios, dutiable at 12½ percent ad valorem or, in the alternative, under item 688.40 as electrical articles, not specially provided for, dutiable at 11½ percent ad valorem. We hold that the government's classification is incorrect and that the articles are properly classifiable as radios dutiable at 12½ percent.

The relevant provisions of the tariff schedules are set out below:

*Subpart E [Schedule 7, Part 5] headnotes:*

1. The articles described in the provisions of this subpart (except parts) shall be classified in such provisions, whether or not such articles are more specifically provided for elsewhere in the tariff schedules * * *—

\*   \*   \*   \*   \*   \*   \*   \*

2. For the purposes of the tariff schedules, a *"toy"* is any article chiefly used for the amusement of children or adults.

*Classified under:*

Toy figures of animate objects (except dolls):
    Not having a spring mechanism:
        Stuffed:

\*   \*   \*   \*   \*   \*   \*   \*

737.30        Valued over 10 cents per inch of height .. 18% ad val.

*Alternative classification claimed by government:*

Toys, and parts of toys, not specially provided for:

\*   \*   \*   \*   \*   \*   \*   \*

737.90      Other  ...............................35% ad val.

*Classification claimed by plaintiff:*

Radiotelegraphic and radiotelephonic transmission and reception apparatus; radiobroadcasting and television transmission and reception apparatus * * *:

\*   \*   \*   \*   \*   \*   \*   \*

Radiotelegraphic and radiotelephonic transmission and reception apparatus; radiobroadcasting and television transmission and reception apparatus, and parts thereof:

\*   \*   \*   \*   \*   \*   \*   \*

685.22      Other  ...........................12.5% ad val.

*Alternative classification claimed by plaintiff:*

688.40   Electrical articles, and electrical parts of articles, not specially provided for ............11.5% ad val.

We consider first the facts established by the record.[1] An examination of a sample of the importation shows that it is a stuffed animal, approximately 12 inches long, 10 inches high at the highest point, and 7 inches wide. It is covered with white plush and is shaped to represent a poodle dog. It has plastic eyes, a red felt tongue, and a red collar with a metal chain attached. Protruding on the nose of the poodle is a black knob, which serves as an on/off switch and volume control for a radio which is housed inside the animal. A similar white knob protruding from the chest between the legs is the station selector. In the interior of the animal a speaker is located at the back of the head, while a transistor radio and battery are located at the dog's underside recessed in a zippered compartment. Apart from the on/off volume control knob, the station selector knob and the zipper on the bottom, there is nothing readily visible to indicate the poodle has an electronic function.

The parties stipulated that the radio portion is the component in chief value of the overall poodle dog radio. The importations were bought and sold by the importer as radios; were displayed in the plaintiff-importer's showroom as novelty radios on the same counters as electronic items such as tape recorders, table radios and novelty radios (which included gramophone radios, sewing box radios and telephone radios); and plaintiff paid the federal excise tax applicable to radios upon the sale of each imported article.

In the two-year period from 1965 through 1966, plaintiff imported some 50,000 poodle dog radios similar to those involved here and sold them to chain stores, department stores, etc., and to wholesale jobbers and distributors. Its largest customer for such articles was a retail drug chain which displayed them for sale along with other electronic devices in its camera and valuable sundries departments. They were not sold in toy stores or at toy counters.

Another company which imported similar poodle dog radios (it imported about 50,000 in 1966) likewise bought and sold them as novelty radios. It sold them mainly to giftware stores and jewelry stores. This company does not sell to toy stores and, in fact, does not sell any items which it regards as toys.

A third company which manufactured and distributed animal radios similar to those here in issue sold more than 40,000 of them, mainly to electronic buyers, and department and similar stores. In dealing with such stores, its contact was with the radio buyer and never with the toy buyer. It regarded the item as a "hot" novelty radio.

The record shows, in addition, that a disinterested party, i. e., a national bottler made clear in a newspaper advertisement soliciting orders for "dog radios" that it regarded them as novelty radios and so advertised them to the public.

The imported poodle dog radios were sold at wholesale by plaintiff for $7.50 each. Stuffed animals, comparable in size, were sold by plaintiff to all types of trade, including the toy trade, at prices ranging from $2.00 to $2.50 wholesale. Additional information as to the price aspect was provided by the company which assembled and distributed similar animal radios. This company purchased plush animals in the United States and imported radio units from Hong Kong which it assembled into the animal by cutting an opening therein placing on a zipper, and inserting a small amount of cotton, the speaker and the radio, and then closing and packaging the article. Its cost for the plush animal was 75 cents

1. The record consisted of the testimony of three witnesses for plaintiff, a sample of the importation, and five additional exhibits. Plaintiff's first witness was a buyer for the importer; the second was the president of a firm which distributed domestic products and imported giftware from Japan; and the third witness was associated with an electronic equipment distributorship, as well as a company which assembled novelty radios by putting them into stuffed animals. Defendant called no witnesses and offered no exhibits.

to $1.46 while its duty-paid landed cost for the radio unit was $2.75. Its wholesale price for the completed animal radio was $5.85 and up, as compared with plaintiff's wholesale price of $7.50.

Finally, the record indicates that the imported articles have a longer and inferior plush (which has a tendency to fall off) than a type of stuffed animal sold by plaintiff that children play with. Aside from this characteristic and the presence of a knob and dial in the front, the imported articles are essentially similar in appearance to such stuffed animals.

■ We come now to the legal issues. First, examining the sample of the importation and considering the testimony adduced by plaintiff as to its nature and the relative value and cost of the radio component and of the stuffed animal, with and without the radio component, we think it clear that the articles are more than toy figures of animate objects and hence do not fall within the scope of item 737.30 which covers such figures. Very much in point on this aspect are Cragstan Corporation v. United States, 51 CCPA 27, C.A.D. 832 (1963), and Novelty Import Co., Inc. v. United States, 58 Cust.Ct. 59, C.D. 2889 (1967). Involved in *Cragstan* was a "Baby in Walker" consisting of a miniature of a clothed baby doll supported in an upright position by a metal walker. When a spring mechanism in the doll was wound, the legs of the doll moved back and forth in a walking-like manner. The appellate court affirmed the decision of this court that the merchandise was something more than merely a toy figure of an animate object—as argued by plaintiff—and was properly dutiable under paragraph 1513 of the Tariff Act of 1930 as "toys, not specially provided for, having a spring mechanism." The rationale was expressed thus (51 CCPA at 29):

* * * [T]he walker gives the toy its unique and distinctive character and without it the toy would be merely another baby doll. The toy, as an entity, consists of two components, both equally essential, the baby doll and the walking mechanism, the latter having wheels and part thereof being permanently attached to the baby doll. The walking mechanism is an integral part of the toy. * * *

■ *Novelty Import* involved the same tariff classification question as *Cragstan* and is to similar import. There the merchandise consisted of a "Santa Wind-up Toy"—a Santa Claus figure holding a sign in the left hand and a bell in the right hand. The court held that while the presence of the sign in the left hand may not have characterized the item as more than a figure of an animate object, the addition of the bell in the right hand, which was found essential to the uniqueness of the toy, made it more than just a figure of an animate object. Particularly pertinent are the following tests the court formulated for determining whether or not merchandise is "more than" a figure of an animate object (58 Cust.Ct. at 62):

* * * [T]he questions to be asked in determining whether or not a particular import is "more than" a figure or image of an animate object are these: Whether or not the inanimate portion is integrated with the animate portion; whether or not the inanimate portion is a substantial or incidental part of the whole product; and whether or not the component animate and inanimate parts are essential to the toy article and what it purports to be.

Applying these tests here, it is apparent that the imported articles constitute more than merely stuffed toy figures of an animate object. The record establishes that the main commercial value of the articles is derived from the radio component, which is the component of chief value of the entire article. This is corroborated by the relative cost of the stuffed animal and of the radio components before they are joined, and of the poodle radio and the plain stuffed animal after assembly. Under such circumstances, there can be no doubt that the radio contributes substantially to the uniqueness and value of the entire article. Application of the

holdings in *Cragstan* and *Novelty Import* thus precludes the imported articles from the classification adopted therefor by the government under item 737.30 of the tariff schedules—the successor to the provision for toy figures of animate objects in paragraph 1513 of the Tariff Act of 1930, as modified. Accordingly, the presumption of correctness afforded the government's classification has been overcome.

■ We proceed then to determine the proper classification of the importation. To begin with, there can be no doubt that it constitutes an entirety for tariff purposes—and defendant agrees. The concept of entireties—to elaborate—is that where two or more elements or parts of an entity are (or are intended to be) used or joined together as a unit so that the individual identities of such elements are subordinated to the identity of the combined entity, the entity will be considered an entirety for tariff purposes. See e. g., Astra Trading Corp. v. United States, 56 Cust.Ct. 555, C.D. 2703 (1966), and cases cited at pp. 557–58; Canton Son, Inc. v. United States, 48 Cust.Ct. 398, Abstract 66652 (1962). Cf. United States v. Altray Company, 54 CCPA 107, C.A.D. 919 (1967). The present importations come squarely within this concept. For the poodles and radios are not intended to be sold or used separately. The importations are sold only as units. The on/off switch and volume control of the radio are remotely located at the poodle's nose, and the speaker is also located in the head of the poodle. These parts are connected by wire to the transistor radio, which is located in the dog's underside. The radio can only be turned on and off and have its volume controlled by utilization of the above arrangement. The station selector knob is located between the dog's forelegs and is connected to a metal shaft which is specially designed to protrude from the radio through an opening provided therefor in the poodle so that it can be controlled from outside the radio unit and outside the poodle. These radio units are obviously designed for and committed to use in stuffed animals and cannot otherwise function. By the same token, the openings which have been cut and the zipper which has been installed for insertion of the radio and for changing the battery dedicate the poodles sole use with the radio. In short, there can be no doubt that the poodles and the radios constitute an entirety.

■■ This brings us to the question of whether the imported articles are classifiable as toys, as claimed by the government alternatively, or whether they should be classified as radios or alternatively as electrical articles, as claimed by plaintiff. We conclude that the importations are classifiable as radios and not as toys or electrical articles. We start with the consideration that plaintiff (as we have seen) has overcome the presumption of correctness afforded the government's original classification of the articles as toy figures of animate objects. In this circumstance, there is no presumption of correctness afforded any other classification, even under another provision in the same tariff paragraph. For the "presumption of correctness is limited to the specific classification made, and, in case it be found that the merchandise is not such specific kind, it may not be held that there is a legal presumption that it is some other kind which happens to be included in the same paragraph but of which the appraiser gives no description and the collector makes no mention in his classification." United States v. White Sulphur Springs Co., 21 CCPA 203, 205, T.D. 46728 (1933). See also e. g., Gallagher & Ascher Co. v. United States, 39 Cust.Ct. 1, 5, C.D. 1892 (1957); S. S. Kresge Co. v. United States, 25 Cust.Ct. 89, 91–92, C.D. 1269 (1950). Absent the presumption of correctness of the classification of the imported merchandise, defendant had the burden of showing by competent proof that the merchandise was chiefly used for the amusement of children or

adults.[2] Defendant having failed to offer any evidence whatever concerning the use of the merchandise, it manifestly has not sustained its burden of proof.

■■ But even aside from this consideration, the record clearly establishes that the importations are not essentially playthings—for children or adults—and thus do not come within the toy provisions of the tariff schedules. See e. g., Wilson's Customs Clearance, Inc. v. United States, 59 Cust.Ct. 36, 39, C.D. 3061 (1967). The record shows that the articles were manufactured and merchandised as radios. They were advertised and offered as a premium by disinterested parties as poodle radios. They were sold to chain stores, department stores, drug stores, gift shops and other retail stores, but were not sold to toy stores nor displayed in toy departments. Such evidence of commercial practice—which was adduced through witnesses who sold large quantities of the imported poodle radios and who manufactured other stuffed animal radios—has obvious probative value in determining the characteristics and uses of the merchandise. E. g., Davis Products, Inc. v. United States, 59 Cust.Ct. 226, 230, C.D. 3127 (1967). Moreover, the cost differential between a stuffed animal and the much more expensive poodle radios is another factor indicating (i) that the imported article is not designed for use as a plaything; (ii) that the value to be derived from the use of the imported article is not amusement in the sense of amusement derived from the use of playthings; and (ii) that the real benefits to be obtained from the use of the imported poodle radios are the same as those which are obtained from any other radio.

■ The sample provides potent evidence strengthening these conclusions. The evidentiary value in toy cases of a sample of merchandise was recognized by this court in Wilson's Customs Clearance, Inc. v. United States, *supra*—which involved proper classification of papier mache nodding head animals. Worth repetition is the following excerpt from the court's opinion (59 Cust.Ct. at 40–41):

Nevertheless, as is especially true in toy cases, the sample merchandise can offer potent evidence on the question of use, and when in harmony with the other evidence of record, can permit the drawing of inferences as to use nationally. Fred Bronner Corp., *supra.* There is precedent under the two previous tariff acts for viewing sample evidence as sufficiently persuasive to rebut the presumption of correctness on a toy classification and to shift the burden to the defendant. United States v. The Halle Bros. Co., 20 CCPA 219, T.D. 45995; United States v. Borgfeldt & Co., 13 Ct.Cust. Appls. 620, T.D. 41461.

We are inclined to the view that the present case presents one of those occasions where the sample merchandise itself supplies the necessary persuasiveness to carry the issue for the plaintiff, at least when the presumptive correctness of the collector's classification stands unsupported. The presence of a sharp and rather easily exposed hook renders the merchandise patently unusable by children of tender years. As for those over puberty, *the articles represent essentially passive, uncomical, almost nonmanipulatable, yet finely finished replicas of well-known dog species. As such they are eminently suitable for purposes of display or ornamentation, no matter where that may be, and substantially incapable of functioning as objects of play or amusement in any normal or intelligent use.* It is not a question of their appearing more suitable for one use than another as was the case in Fred Bronner Corp., *supra,* but of their offering mute testimony of their substantial incapability of use as classified. This type of potent evidence when in harmony with all other evidence pre-

2. Plaintiff had no similar burden since its claims are that the merchandise is classifiable as radios or as electrical articles.

sented satisfies the court that a shift in burden on this issue has taken place. [Emphasis supplied.]

■ Like the merchandise in *Wilson's Customs Clearance*, it is apparent from the sample itself in the present case that the stuffed animal feature of the imported article is purely ornamental, essentially passive, and substantially incapable of functioning as an object of play or amusement by children or adults in any normal or intelligent use. Accordingly, the importations constitute novelty radios, and as such, they fall within the *eo nomine* provision in item 685.22 of the tariff schedules for radiobroadcasting and reception apparatus—a tariff designation without limitations, which includes all forms of the articles named. E. g., Nootka Packing Co. et al. v. United States, 22 CCPA 464, 466, T.D. 47464 (1935); United Carr Fastener Corporation v. United States, 54 CCPA 89, 92, C.A.D. 913 (1967).

■ The last matter is whether the novelty poodle dog radio in question should be regarded as more than radios because of the poodle dog exterior and should thus be classified, because of its electrical features, under item 688.40 of the tariff schedules as electrical articles, not specially provided for, as alternatively claimed by plaintiff. We think not. Rather, we conclude—as did this court in Astra Trading Corp. v. United States, *supra,* 56 Cust.Ct. 555—that an *eo nomine* statutory designation of an article, without limitation or contrary legislative intent, includes *all* forms of the articles as they are developed, and is to be preferred to terms of general description and to enumerations which are broader in scope and less specific. The issue in *Astra Trading*, it may be added, concerned the proper classification of merchandise invoiced as "flashlight tools," which consisted of a flashlight portion that was classified under the provision for flashlights, and a screwdriver component that was classified under the provision for screwdrivers and parts. After concluding that the merchandise constituted an entirety, the court rejected plaintiff's argument that the entireties were more than screwdrivers and thus classifiable as an article containing as an essential feature an electrical element or device. Instead, the merchandise was held—for the reasons set out above— properly dutiable under the *eo nomine* provision for screwdrivers. See also e. g., United Carr Fastener Corporation v. United States, *supra,* 54 CCPA 89.

The protest is sustained. Judgment will be entered accordingly.